UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
MADELEINE LILL,                         )
                    Plaintiff,          )
                                        )    CIVIL ACTION
        v.                              )    NO. 10-10697-WGY
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner, Social Security           )
Administration,                         )
                    Defendant.          )
_____ )


MEMORANDUM OF DECISION

YOUNG, D.J.                                September 23, 2011


I.   **INTRODUCTION**

        The plaintiff, Madeleine Lill ("Lill"), brings this action

pursuant to section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), seeking judicial review of the final decision of the

Commissioner of Social Security (the "Commissioner").  Lill

challenges the decision of the Administrative Law Judge (the

"hearing officer") denying her application for Supplemental

Security Income ("SSI") benefits and Social Security Disability

Insurance ("SSDI") benefits.  She argues that the Commissioner's

decision was not based on substantial evidence, specifically

claiming that the hearing officer's assessment of her residual

functional capacity was improper because he afforded too little

weight to her subjective complaints and too much weight to the

1

opinion of the medical expert.  Pl.'s Mem. L. Supp. Reversal
Comm'r Denial Benefits ("Lill Mem.") 12-20, ECF No. 18.  Lill
requests that this Court reverse the decision of the Commissioner
and remand the case to the Commissioner.  Id. at 1.  The
Commissioner filed a motion for an order affirming his decision.
Def.'s Mot. Affirm Comm'r Decision, ECF No. 19.

**A.   Procedural Posture**

Lill filed for SSI and SSDI benefits on or around October 4,
2007.  Admin. R. 105-12.  On February 26, 2008, the Commissioner
denied both of Lill's applications.  Id. at 52-53, 62-65.  Upon
request for reconsideration, Lill's applications were reevaluated
and again denied on May 20, 2008.  Id. at 54-55.  Lill requested
an oral hearing, and such hearing took place before hearing
officer Barry Best on May 20, 2009.  Id. at 19-51.  The hearing
officer issued a decision unfavorable to Lill on October 30,
2009, stating that Lill was not disabled within the meaning of
the Social Security Act from the alleged onset date through the
date of the decision.  Id. at 4-18.

The hearing officer's decision was selected for review by
the Decision Review Board (the "Board"), but the Board did not
complete its review within the prescribed ninety-day period.  Id.
at 1-3.  Consequently, the hearing officer's decision became the
final decision of the Commissioner.  Id.; see 20 C.F.R.
§ 405.420(a)(2).  On April 26, 2010, Lill filed the present

2

action with this Court to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).  See Compl. 1, ECF No. 1.

### B.   Factual Background

Lill was born on August 1, 1961.  Admin. R. 52.  She has a high school education and has been employed as a stock control clerk, customer service representative, customer service supervisor, and account clerk.  Id. at 16, 39, 149.

Lill began receiving mental health counseling as a teenager. Id. at 389.  She was treated for bipolar disorder from 1997 to 2006.  Id. at 425.  In 2007, Lill was treated at Saint Anne's Hospital in Fall River, Massachusetts, for anxiety, stress reactions, and nonspecific chest pain.  Id. at 212-13.  She was prescribed Lorazepam and Hydroxyzine HCL.  Id. at 213.  Dr. John Pedrotty ("Dr. Pedrotty") began serving as Lill's primary care physician in July 2007 and through the relevant period.  Id. at 261.

From September 2007 to January 2008, Lill received mental health treatment at Tapestry Psychotherapy because she was "having trouble dealing [with] sexual harassment at work."  Id. at 425-29.  She reported having nightmares, chest pain, depressed mood, loss of energy, anxiety, and trouble concentrating, among other symptoms.  Id. at 426.  Lill was diagnosed with bipolar disorder and depression and given a global assessment of functioning ("GAF") score of 50.  Id. at 428.

3

Lill was admitted to Corrigan State Hospital from October 28 to October 31, 2007, after reporting that she was "hearing voices telling her to hurt herself."   Id. at 215.   She presented as depressed, indicated "feeling worthless and hopeless," and was having thoughts of suicide.   Id.   Her GAF score was reported as a 32.   Id.   Lill was discharged after having "rapidly improved." Id. at 217.   Lill's treating physician noted his skepticism, however, that her hallucinations had gone "from continuous and overwhelming to 'not a problem' in three days."   Id. at 218.   The doctor stated that her quick change in presentation seemed to occur in response to finding out that "emergency assistance (Welfare), would only pay her a few hundred dollars a month," leading him to suspect a "possible embellishment of the clinical picture when admitted for secondary gain."   Id.

On November 24, 2007, Lill went to the emergency room at Saint Anne's Hospital after reportedly attempting suicide.   Id. at 411-24.   Soon thereafter, on November 28, 2007, Lill again was admitted to Corrigan State Hospital for depression, anxiety, and panic attacks.   Id. at 263-66.   Upon her discharge on December 6, 2007, Lill had experienced "significant improvement" and was authorized to return to work because Dr. Jose Afonso observed "no evidence of any significant impediment . . . and her current duties (stocking and cleaning) [at Kmart] are of low stress . . . ."   Id.

4

In January 2008, Lill overdosed on her psychiatric
medications and continued to hear voices telling her to kill
herself.  Id. at 323-24.  By March 2008, Lill was having three to
four panic attacks per week but felt that her medication
(Lorazepam) helped her and allowed her to return to working ten
to twenty-four hours per week.  Id. at 353.

During much of this time, from October 3, 2007 to July 16,
2008, Lill also was receiving treatment from Child and Family
Services, Inc.  Id. at 296-304, 449-60, 464-73.  There, she
reported frequent panic attacks, difficulty concentrating, sleep
disturbances, and loss of appetite.  Id. at 297-98.  In December
2007 and February 2008, she was diagnosed with bipolar disorder
and post-traumatic stress disorder ("PTSD") and given a GAF score
of 45.  Id. at 296.  On May 1, 2008, Lill reported experiencing
more panic attacks due to an increase in her hours at work.  Id.
at 452.  On May 5, 3008, however, Lill reported that her panic
attacks had decreased in frequency that week and that she was
managing "ok" with working many hours.  Id. at 466.  On May 28,
2008, Lill reported that she had experienced a "massive" panic
attack at work the previous week and took an excess of Lorazepam.
Id. at 467.  On June 4, 2008, Lill reported that she had returned
to work after having taken off two-and-one-half weeks because of
her increased anxiety levels.  Id. at 468.  By June 18, 2008,
Lill again was reporting an increase in depression, low mood,

isolation, and difficulty sleeping; she was given a GAF score of 51.  Id. at 471.  In July 2008, Lill was fired from her job at Kmart after allegedly stealing $300.00 from the cash register and also was being evicted from her apartment.  Id. at 472-73.  Lill expressed that she had an urge to "just OD (overdose) on pills" after she was terminated, and she presented as tired with her affect restricted and her mood low.  Id.

Lill began treatment at Arbour Counseling Services ("Arbour") on July 22, 2008.  Id. at 481-84.  At Arbour, Lill was treated by Danielle Zito Fedorov ("Fedorov"), a nurse practitioner, and Renee McNeilly ("McNeilly"), a social worker. Id. at 481-84, 507.  Lill complained of depressed mood, voices in her head telling her that she was worthless and urging her to commit suicide, feelings of guilt, impaired sleeping patterns, impaired concentration, and anxiety.  Id. at 481-82.  She was diagnosed with schizoaffective disorder bipolar type, generalized anxiety disorder, and social phobia and given a GAF score of 30. Id. at 484.  At the time, she was taking Zypreza, Celexa, Clonozepam, Ambien, and Lamictal.  Id. at 483.

From July 2008 through March 2009, Lill met regularly with Fedorov and McNeilly, who noted that Lill continued to experience cycles of positive progress followed by periods of impaired sleep patterns, feelings of worthlessness, auditory hallucinations, suicidal ideations, nightmares, and anxiety.  Id. at 507-35.  On

April 14, 2009, McNeilly opined that Lill had marked limitations in interacting appropriately with the public and supervisors and had difficulty responding appropriately to usual work situations. Id. at 536.

On August 6, 2008, Lill was evaluated by Dr. E. Kisch who noted Lill's "major difficulties" with "concentration and persistence" as well as with appropriate interaction with coworkers.  Id. at 479.

On February 14, 2008, Dr. Steven Fischer ("Dr. Fischer") prepared a Psychiatric Review Technique Form and a Residual Functional Capacity Assessment for Lill.  Id. at 333-46, 347-50. Dr. Fischer concluded that Lill's mental impairments imposed mild limitations on her daily activities and moderate limitations on her social functioning and ability to maintain concentration, persistence, or pace.  Id. at 343.  Dr. Fischer opined that, while Lill was capable of carrying out simple instructions in a normal workday and workweek and interacting around work-related issues, she would need a supportive supervisor.  Id. at 349.

Dr. Herbert Rothfarb ("Dr. Rothfarb"), a psychologist for Disability Determination Services of the Massachusetts Rehabilitation Commission, conducted a consultative examination on Lill.  Id. at 354-62.  Noting Lill's reports of hypomanic and manic episodes, racing thoughts, psychomotor agitation, suicidal ideations, feelings of guilt and worthlessness, fatigue, and

difficulty concentrating, Dr. Rothfarb diagnosed Lill with
bipolar disorder with psychotic features, PTSD, panic disorder
with agoraphobia, and a personality disorder.  Id. at 357-58,
360.  Dr. Rothfarb opined that Lill could "complete a normal
workday without being significantly interrupted by symptoms,"
"make simple work-related decisions," "work without supervision
and . . . understand and remember locations and work-related
procedures," "get along with co-workers," and "respond
appropriately to changes in the work setting."  Id. at 362.  Dr.
Rothfarb believed that it was "remarkable" that Lill was able to
maintain part-time employment at Kmart despite her severe
symptoms.  Id.

Dr. Eileen Lynch ("Dr. Lynch"), a nonexamining state agency
psychologist, reviewed the relevant medical evidence and opined,
like Dr. Fischer, that Lill had mild restrictions with regard to
daily activities and moderate restrictions with regard to social
functioning and concentration, persistence, or pace.  Id. at 374.
She further noted that Lill was able to remember and carry out
simple tasks, focus for short periods of time over a full
workday, relate adequately to others (although she was anxious in
public), and manage routine change.  Id. at 380.

Dr. Henry Schniewind, a physician, reviewed Dr. Lynch's
assessment and opined in May 2008 that Lill was improving with
treatment.  Id. at 385.  He added, however, that she should not

work with the general public.  Id. at 388.

Dr. Barbara Stelle ("Dr. Stelle"), a psychiatrist, noted in August 2009 that Lill had experienced an increase in auditory hallucinations telling her that she was worthless and should kill herself.  Id. at 804-05.  Dr. Stelle noted Lill's "very flat affect" and depressed mood but indicated that she was "very cooperative," used appropriate language, and maintained good eye contact.  Id. at 806.  Dr. Stelle found no evidence of psychotic thinking and diagnosed Lill with PTSD, bipolar disorder with psychotic features, polysubstance abuse in remission, and active alcohol abuse.  Id.

At the oral hearing held on May 20, 2009 before the hearing officer, Dr. Stuart Gitlow ("Dr. Gitlow"), a medical expert, testified that he had reviewed Lill's history and found that her ability to work part-time contradicted the opinions of several treating sources that she was markedly impaired at the time.  Id. at 27-29.  He questioned whether the treating sources, when speaking of Lill being markedly impaired, were making a medical determination or simply a general observation.  Id. at 27-28. Dr. Gitlow acknowledged that Lill had problems with mood instability and auditory hallucinations but noted that "[t]he degree of severity of those difficulties, even when they were taking place and were clearly documented, was not so great as to prevent the claimant from working up to 24 hours a week at work."

Id. at 32.  He also testified that Lill's instability "seems to be related to alcohol use." Id. at 28.  Based on his consideration of Lill's longitudinal medical history, Dr. Gitlow disagreed with the opinions of Lill's treating sources as to her limited functional capacity, concluding instead that Lill was no more than mildly impaired and did not meet or medically equal any of the listings of impairment. Id. at 29-33, 37.

At the hearing, Lill testified that she almost never went out of the house and owned a car but rarely drove. Id. at 42-43. She stated that she spent roughly six hours per day writing in her journal and used a computer mainly to communicate via e-mail with family and friends. Id. Lill testified that after being fired from Kmart she had tried to find other jobs at Dunkin' Donuts and McDonald's to no avail. Id. at 40.  She claimed that she could not work full-time because of her anxiety and panic attacks. Id. at 45.

Ronald Brierre ("Brierre"), a vocational expert, also testified at the hearing. Id. at 47.  The hearing officer asked Brierre to consider a hypothetical individual of Lill's age, education, and past relevant work experience with a residual functional capacity for work at all exertional levels who would be able to maintain attention and concentration sufficient to perform unskilled work tasks, require breaks every two hours, deal with the public on an occasional basis so long as the

interaction was limited to a hand-off of work products or materials, work in the presence of coworkers and deal with them appropriately on a social or casual basis occasionally but not frequently or continuously, and work with supervisors appropriately on an occasional basis. Id. Brierre opined that a person with those limitations would not be able to perform any of the work Lill had performed in the past. Id. at 49. Brierre testified that such a hypothetical individual would, however, be able to perform a number of jobs, including assembler, bench worker, or packager. Id. Finally, Brierre testified that if Lill could not work full-time, she would not be able to perform these jobs. Id. at 50.

## II.  LEGAL STANDARD

### A.   Standard of Review

Under 42 U.S.C. § 405(g), a district court has the power to affirm, modify, or reverse a decision of the Commissioner.  The district court must make its decision based on the pleadings and transcript of the record before the Commissioner; "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); see Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).  The First Circuit has clarified this standard as requiring a court to uphold the Commissioner's findings if "a reasonable mind, reviewing the

evidence in the record as a whole, could accept it as adequate to support his conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  As it is the role of the Commissioner to draw factual inferences, make credibility determinations, and resolve conflicts in the evidence, the Court must not perform such tasks in reviewing the record.  Id.  Complainants face a difficult battle in challenging the Commissioner's determination because, under the substantial evidence standard, the Court must uphold the Commissioner's determination, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriquez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).

B.   **Social Security Disability Standard**

An individual is considered disabled if he is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The Social Security Administration has promulgated a five-step sequential analysis to determine whether a claimant is disabled.  See 20 C.F.R. § 404.1520.  The hearing officer must

determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals an impairment listed under 20 C.F.R. Part 404, Subpart P, Appendix 1, and meets the duration requirement; (4) whether the claimant has the residual functional capacity to perform his past relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience.  Id.

The claimant bears the burden in the first four steps to show that he is disabled within the meaning of the Social Security Act.  Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 7 (1st Cir. 1982).  Once the claimant has established that he is unable to return to his former employment, the burden shifts to the Commissioner to prove the fifth step, that the claimant is able to engage in substantial gainful activity that exists in significant numbers in the national economy.  Id.

## III. THE HEARING OFFICER'S DECISION

Applying the five-step analysis, at the first step, the hearing officer found that Lill had not engaged in substantial gainful activity since September 1, 2007.  Admin. R. 9.  At the second step, based on the medical history, testimony at the hearing, and expert opinions, the hearing officer found that Lill's bipolar disorder, PTSD, and history of alcohol abuse

13

constituted "severe impairments" during the relevant time period. Id. at 10.  At the third step, the hearing officer found that none of these impairments, however, met or medically equaled any of the listed impairments in Appendix 1 of Subpart P of Part 404. Id.  At the fourth step, the hearing officer held that Lill retained the residual functional capacity to perform a full range of work at all exertional levels but with nonexertional limitations, including maintaining concentration and attention sufficient to perform simple work tasks for an eight-hour work day assuming short work breaks every two hours and interacting appropriately with the public, co-workers, and supervisors on an occasional basis.  Id. at 12.  At the fifth step, based on this residual functional capacity, the hearing officer found that Lill could perform work that exists in significant amounts in the national economy, including jobs such as assembler, bench worker, and packager.  Id. at 17.  The hearing officer therefore concluded that Lill had not been disabled since September 1, 2007.  Id. at 18.

**IV.  ANALYSIS**

Lill contests the hearing officer's determination of her residual functional capacity, arguing that the hearing officer failed properly to evaluate her subjective complaints and gave undue weight to the opinion of Dr. Gitlow.  Lill Mem. 12, 14.

**A.  Assessment of Lill's Credibility**

14

Lill contends that the hearing officer's evaluation of her disability was improper under <u>Avery</u> v. <u>Sec'y of Health and Human Servs.</u>, 797 F.2d 19 (1st Cir. 1986); 20 C.F.R. §§ 404.1529, 416.929; and SSR 96-7p, 1996 WL 374186 (July 2, 1996), because he discredited her subjective reports of symptoms.   Lill Mem. 12.

"It is the responsibility of the [hearing officer] to determine issues of credibility and to draw inferences from the record evidence." <u>Irlanda Ortiz</u>, 955 F.2d at 769.  The First Circuit has explained that when a claimant's testimony is discredited, the hearing officer "must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]." <u>Da Rosa</u> v. <u>Sec'y of Health & Human Servs.</u>, 803 F.2d 24, 26 (1st Cir. 1986).  When supported by substantial evidence, the reviewing court will defer to the credibility determination of the hearing officer, "who observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence . . . ." <u>Frustaglia</u> v. <u>Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir.1987).

In <u>Avery</u>, the First Circuit set forth certain factors that must be considered in evaluating a claimant's subjective complaints.   797 F.2d at 29.  These factors include the nature, duration, frequency, and intensity of symptoms; precipitating and aggravating factors such as movement, activity, and environmental

15

conditions; type, dosage, effectiveness, and side effects of medication taken to alleviate symptoms; treatment other than medication to alleviate symptoms; functional restrictions; and the claimant's daily activities.  <u>Id.</u>

In assessing the credibility of Lill's testimony and reports, the hearing officer explained that her medically determinable impairments reasonably could be expected to cause some of the symptoms of which she complained.  Admin. R. 13.  He concluded, however, that Lill's statements as to the "intensity, persistence and limiting effects" of her symptoms were not entirely credible.  <u>Id.</u>

In his written decision, the hearing officer specifically noted the evidence upon which he relied in coming to his conclusion.  The overarching issue for the hearing officer was the contradiction between Lill's complaints of auditory hallucinations and overall emotional instability and the many treatment notes stating that Lill presented as "largely normal," having "full orientation, clear thought process, [and] good concentration" and acting "cooperative[ly] and appropriate[ly] in her interactions with examiners."  <u>Id.</u> at 13-14.

With regard to this seemingly contradictory record, the hearing officer further noted that "while [Lill] experiences social interaction deficits, her appropriate interactions with care providers and examiners and her ability to perform the

16

duties of a customer service representative indicate that her
social limitations are no more than moderate in severity." Id.
at 14.  The hearing officer also noted that Dr. Rothfarb
expressed his surprise that Lill was able to maintain gainful
employment despite her subjective complaints of auditory
hallucinations and reports of panic disorder.  Id.

The hearing officer cited several treatment notes where the
treating sources found no evidence of symptoms.  Id.  He cited
specifically to Dr. Stelle's note that there was no evidence of
psychotic thinking despite Lill's report that she was hearing
loud voices during the evaluation.  Id.  The hearing officer also
cited to treatment notes from November 2008, when Lill denied any
depression or anxiety.  Id. at 13.  Finally, the hearing officer
emphasized Dr. Gitlow's testimony that Lill's objective
contemporaneous medical and work history revealed her to be
affected "by no more than a generally mild disorder." Id. at 14.

On these articulated bases, the hearing officer concluded
that although Lill was "generally affected by mild to moderate
functional deficits . . . . her allegations of substantial
functional limitations are largely unsupported by objective
medical findings." Id.

Lill contends that the hearing officer erred in failing to
weigh the above evidence against evidence of her previous work
history, Lill Mem. 13 (noting that Lill had worked for eighteen

17

years and that "[s]uch a consistent work history should lend
support to her credibility"), and her restricted daily
activities, id. at 14 ("The activities of the plaintiff do not
demonstrate ongoing activity that would suggest the ability to
perform substantial gainful activity 8 hours a day, 5 days a
week.").

The hearing officer based his credibility determination on
the whole record.  It cannot be said that the hearing officer's
decision to discredit Lill's testimony lacks sufficient
evidentiary support.  As explained above, the hearing officer's
decision was based on the inconsistencies between Lill's reports
of symptoms and limitations and the objective and medical
evidence.  He expressly considered Lill's testimony that she
could not leave her home alone and had sleep disturbances but
nevertheless found that she could concentrate, work as a customer
service representative, and have appropriate interactions with
care providers and examiners.  Admin. R. 12-16.  He is not
required expressly to discuss every factor enumerated in Avery.
See Gordlis v. Sec'y of Health and Human Servs., 921 F.2d 327,
330 (1st Cir. 1990).

Essentially, Lill is asking this Court to reweigh the
evidence presented to the hearing officer.  Though a contrary
decision might reasonably have been reached in this case had
Lill's testimony been credited, it is not the function of this

18

Court to second-guess credibility assessments of the hearing officer that are supported by sufficient evidence.  See Rodriquez, 647 F.2d at 222.  Especially in a scenario where the claimant bears the burden of proof, this Court will not disturb a finding the hearing officer made while he was performing his evidentiary duty.

**B.  Weight Given to Medical Expert**

**1.  Dr. Gitlow's Substantive Testimony**

Lill finds fault in the substance of Dr. Gitlow's testimony, namely his emphasis on her ability to work part-time for several months during the relevant period, his failure to discuss her medication regime, and his opinion that the fact that Lill was not being treated by a physician for her mental illness evidenced the mildness of her symptoms.  Lill Mem. 14-17.

Dr. Gitlow is an impartial medical expert under contract with the Commissioner of the Social Security Administration.  He reviewed Lill's longitudinal medical file and testified that Lill's condition had not worsened over the years and that, although she has exhibited periods of instability, she appeared largely unimpaired.  Admin. R. 32.

"State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."  20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).

"The Secretary may (and, under his regulations, must) take [such] medical evidence.  But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts." Rodriquez, 647 F.2d at 222.

Although the hearing officer acknowledged that Dr. Gitlow's opinion was given "substantial weight," that does not mean his opinion was adopted in toto.  Even assuming, arguendo, that parts of Dr. Gitlow's testimony were factually or legally flawed,[1] the conclusion in this case does not rest solely upon the reports of this medical expert.  Instead, the hearing officer spent several pages of written text addressing the opinions of other various medical and psychological professionals, weighing the evidence on

---

[1] The Court is not convinced that Dr. Gitlow's testimony was flawed, as Lill contends.  For example, Lill argues that "Dr. Gitlow failed to discuss the plaintiff's medication regimen in discussing her mental impairment."  Lill Mem. 16.  The record is clear, however, that the hearing officer was well aware of the medications that Lill was taking.  See Admin. R. 13, 32-33.  At the oral hearing, the hearing officer even inquired of Dr. Gitlow about the side effects of the many medications Lill had been taking.  Id. at 32-33.  That Dr. Gitlow may not have discussed Lill's medications exhaustively and their impact on her mental health is of no moment because the hearing officer manifestly considered the record as a whole.

Lill also argues that Dr. Gitlow improperly emphasized her ability to work part-time during the relevant period.  Lill Mem. 14-15.  While Lill is correct that working part-time is not the same as engaging in substantial gainful activity, Dr. Gitlow was not making this determination.  Instead, he was using the objective evidence of Lill's part-time work history as part of his analysis of the degree of Lill's impairment.  Admin. R. 28.

the record and making findings based on the record as a whole.
It is not the place of this Court to reweigh or reevaluate the
evidence. See id. at 224. Instead, this Court must uphold the
hearing officer's findings because, as discussed above, a
reasonable mind, reviewing the evidence in the record as a whole,
could accept it as adequate to support his conclusion.[2] See
Irlanda Ortiz, 955 F.2d at 769.

### 2. Weight Given to Treating Sources

In arguing that Dr. Gitlow's testimony ought not have been
given substantial weight, Lill argues that the opinions of her
treating sources support her substantial impairment and ought
have been given more weight by the hearing officer. Lill Mem.
17-18. Lill argues that this improper weighting is particularly
problematic because nearly all of the other sources thought her
to be more impaired than Dr. Gitlow had concluded. Id. at 18.

Lill's treating sources did not testify at the oral hearing,
but their treatment notes are part of the record before the
hearing officer and now this Court. Also before this Court is
the testimony of Dr. Gitlow. In his written decision, the
hearing officer explicitly stated that he gave "significant
weight" to the testimony and opinion of Dr. Gitlow while he gave

---

[2] What is more, Lill had the opportunity at the oral hearing
to cross-examine the medical expert. Admin. R. 34-38. Any
issues Lill had with Dr. Gitlow's emphasis or ignorance of
certain factors would more properly have been addressed at that
time.

"little evidentiary weight" to the opinions and evaluations of various treating sources because he found them to be inconsistent with the objective medical findings in the record. Admin. R. 15-16.

Generally, the hearing officer is bound to lend "more weight to opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's medical] medical impairment(s) . . . ." 20 C.F.R. § 404.1527(d)(2). This, however, is only true when these opinions are not inconsistent with the other substantial evidence in the record. <u>Id.</u> The hearing office "is not required automatically to give controlling weight to any 'treating' doctor's report," <u>Rivera</u> v. <u>Sec'y of Health & Human Servs.</u>, No. 92-1896, 1993 WL 40850, at *3 (1st Cir. Feb. 19, 1993) (emphasis removed), and in fact "may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors," <u>Castro</u> v. <u>Barnhart</u>, 198 F. Supp. 2d 47, 54 (D. Mass. 2002) (Swartwood, M.J.). <u>See also</u> 20 C.F.R. § 404.1527(d)(4). If a hearing officer decides not to give controlling weight to the opinions of treating sources, he must "give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20

22

C.F.R. § 404.1527(d)(2).

Here, the hearing officer considered but ultimately gave little weight to the opinions of Dr. Pedrotty, McNeilly, and Federov.  Admin. R. 15-16.  The hearing officer noted that although these sources have specialized knowledge as treating practitioners, their opinions are not supported by the medical evidence.  Id.  The hearing officer further concluded that the opinion of Dr. Gitlow was entitled to more weight because Dr. Gitlow "had the most recent opportunity to review the claimant's longitudinal medical file, and his conclusions are consistent with the record as a whole."  Id. at 16.

Based on the evidence of record, the hearing officer's decision not to give controlling weight to the treating sources' opinions was proper.  The medical record as a whole suggests that although Lill was mildly impaired and reported suicidal ideations and panic attacks, she was able to interact appropriately with counselors and doctors and periodically to maintain part-time employment.  Essentially, the medical record supports Dr. Gitlow's conclusion that Lill's limitations were not as limiting as Lill alleged.  Id. at 14.

The propriety of the hearing officer's decision is particularly illuminated when the facts are considered in light of the hearing officer's credibility determination, as discussed above.  Given the hearing officer's low evaluation of Lill's

credibility, it is possible that he similarly discredited the reports of treating physicians who relied heavily on Lill's self-reports.  See Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted . . . .").

The record as a whole supports the hearing officer's decision to give more weight to the opinion of Dr. Gitlow than those of the treating sources.  Accordingly, the hearing officer's determination, as part of his finding of Lill's residual functional capacity, that Lill is able to maintain concentration and attention for simple work tasks and interact appropriately with the public, co-workers, and supervisors on an occasional basis was supported by substantial evidence and must be affirmed.  Admin. R. 15.

## V.   CONCLUSION

For all the reasons stated above, this Court DENIES Lill's motion for an order reversing the decision of the Commissioner, ECF No. 17, and GRANTS the Commissioner's motion to affirm the Commissioner's decision, ECF No. 19.  Judgment shall enter for the Commissioner.

SO ORDERED.

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE

24